## OMMEN v. TALCOTT.

(District Court, S. D. New York. December 13, 1909.)

1. **BANKRUPTCY (§ 116\*)—ACTION BY TRUSTEE TO RECOVER PREFERENCE—MEASURE OF RECOVERY—CONTRACT OF RECEIVER.**

   A contract between a receiver in bankruptcy and a claimant of a stock of merchandise which he had taken into his possession from the bankrupt just prior to the filing of the petition, made with the approval of the court, by which the latter was authorized to sell the goods, construed, and *held* to constitute a waiver by the receiver of any right of himself or the trustee to charge the claimant with the actual value of the goods then unsold, regardless of the amount received therefor, but to substitute for the goods themselves the proceeds actually realized therefor on their sale so far as concerned any claim of the receiver, but not to apply in that respect to goods previously sold by the claimant without any agreement.

   [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 116.\*]

2. **BANKRUPTCY (§ 116\*)—SALE OF PROPERTY BY ADVERSE CLAIMANT—CONSENT BY RECEIVER.**

   A court of bankruptcy has jurisdiction, with the consent of an adverse claimant of property in possession, to authorize its receiver after adjudication, though out of possession, to consent to a sale of the property in the interest of its preservation under the joint supervision of the receiver and adverse claimant, leaving their respective claims to the proceeds to be thereafter determined.

   [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 116.\*]

3. **BANKRUPTCY (§ 116\*)—CLAIMS BY THIRD PERSONS—SALE—ESTOPPEL OF TRUSTEE TO QUESTION.**

   A trustee in bankruptcy who for four years after his appointment made no objection to a sale of property made by an adverse claimant under an agreement with the receiver who preceded him with the approval of the court is estopped to thereafter question the validity of the contract.

   [Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 116.\*]

**4. EVIDENCE (§ 113*)—VOIDABLE PREFERENCE—SUIT BY TRUSTEE FOR ACCOUNTING—VALUE OF PROPERTY.**

The value of merchandise received by a creditor of a bankrupt as a preference for the purpose of an accounting therefor in equity is what it will sell for under normal conditions, and, where there has been a sale under such conditions, the best evidence of such value is the price realized at such sale.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 113.*]

**5. BANKRUPTCY (§ 154*)—PREFERENTIAL TRANSFER OF PROPERTY—ACCOUNTING BY CREDITOR.**

A creditor to whom a bankrupt transferred property under circumstances which made it an unlawful preference and who sold the same on an accounting therefor in equity is not entitled to credit for any service rendered or disbursement made in making such sale.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 154.*]

**6. BANKRUPTCY (§ 168*)—PREFERENTIAL TRANSFER OF PROPERTY—ACCOUNTING BY CREDITOR—INTEREST.**

A creditor who obtained a preferential transfer of property from a bankrupt from the time he was advised that the bankrupt's receiver claimed the property for the estate held it as a trustee ex maleficio, and is chargeable with interest at the legal rate at least from the time when he sold it even as to such as was sold under an agreement with the receiver, which was without prejudice to the right of the receiver to the proceeds.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 168.*]

**7. BANKRUPTCY (§§ 473, 474*)—ACTIONS BY TRUSTEE—COSTS.**

A trustee in bankruptcy who succeeds in a suit to require an accounting for an unlawful preference is entitled to costs up to the time such accounting is ordered, although he claimed more in his bill than he was given by the decree, but is liable for the costs and disbursements of the accounting where they were made in respect to disputed items as to which he was unsuccessful.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. §§ 473, 474.*]

**8. COURTS (§ 352*)—FEDERAL COURTS—EQUITY—HEARING BEFORE MASTER—REPORT.**

A master in chancery in a suit in a federal court should not rule on requests to make findings of fact, made by a party after service of his draft report, which are not known to the federal equity practice, nor should he embody such rulings if made in his report.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 352.*]

In Equity. Suit by Alfred E. Ommen, as trustee in bankruptcy of the John A. Baker Notion Company, against James Talcott. On report of special master. Final decree.

This cause comes up for final decree upon the report of a special master appointed by an interlocutory decree entered May 9, 1907. The suit was brought to recover a stock of goods taken by the defendant, a creditor, from the store of the bankrupt on the 15th day of December, 1902. An involuntary petition in bankruptcy was filed against the bankrupt on the following day, which was followed by an adjudication on January 9, 1903, and the plaintiff was appointed trustee on April 23, 1903. It is of no consequence at this stage of the cause to rehearse the facts which led up to the interlocutory decree of May 9, 1907, except to state that that bill was drawn upon the theory that, when the defendant seized possession of the goods on the day before the bankruptcy, he obtained an unlawful preference, which he was obliged to give up to the trustee. That issue having been decided and the defendant having sold all the goods meanwhile, the question remained for final decree of ascertaining what was the measure of the defendant's liability in his account-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ing. The stock consisted of a store of miscellaneous articles of great number and small value, known in the trade as "novelties." In stating the account, the defendant has charged himself with the proceeds actually received, and the complainant wishes to surcharge him with the difference between those proceeds and what he insists to be the actual value of the goods.

The interlocutory decree did not decide this question, nor did it define the way in which the account should be stated. However, it referred to a contract between the complainant, then a receiver, and the defendant, dated January 15, 1903, and confirmed by the court of bankruptcy the next day, by virtue of the apparent authority of which the defendant sold, and the construction to be put on that contract is the important issue upon final decree. The complainant says that the contract did not change the relations of the parties, and that, if it made rightful the defendant's subsequent sales of the goods, yet it reserved to him as receiver the same rights as though the sales had been wrongful. The sales nearly all took place during the first six months of the year 1903, after which time the stock was substantially in the form of cash.

The defendant insists that the contract gave a consent to the sales and reserved the same rights in the proceeds as had existed in the stock, but no other rights, and that the stock was of a kind which time would injure and which must have been sold, unless both parties were to lose largely. Therefore he insists that he had every inducement to sell, if the complainant would allow him to substitute the proceeds for the goods. He further says, on the other hand, that the complainant, being out of possession, had every inducement to allow the defendant so to substitute the proceeds for the goods, because of the defendant's excellent facilities for realizing upon such a stock, and he had no reason to fear such a sale, since it was the most likely way of getting their actual value.

The complainant, while conceding that it was to the defendant's advantage to sell, insists that he, as receiver, reserved his own rights precisely as though no contract had been made, and that, now that the sales have been made under the contract, he may charge the defendant with the value of the goods precisely as though his sales had been as unauthorized as was his possession. He relies upon the following phrases contained in the recitals:

"Whereas it is the desire of the respective parties hereto to realize the greatest possible value for the said property so held by the party of the second part, without prejudice to the respective rights of the said parties hereto, in and to the said property so held by the said party of the second part as aforesaid, and

"Whereas the said parties hereto are also desirous of preserving their respective interests and those of the trustee in bankruptcy hereafter to be appointed, * * * and that the ends and purposes hereinbefore expressed will be best accomplished by an orderly disposition of the said property under their joint supervision and control as hereinafter more particularly provided.

"Now therefore in consideration of the premises, and without prejudice to any rights and remedies of either of the parties hereto, and without prejudice to any action or proceeding that the trustee in bankruptcy * * * may deem necessary * * * and without prejudice to the rights or remedies of any of the individual creditors * * * and agreeable (sic) to the end and purpose that the said property may be reduced to cash * * * and that the parties hereto and said trustee and creditors shall have respectively the same rights and interests in the proceeds as they had in the property itself previous to such reduction."

The substance of the agreement is a consent to the sale of the goods on joint account, the defendant to charge his expenses and to retain from the net proceeds as much as he was entitled to under the original agreement with the bankrupt, paying the balance to the complainant.

The contract concludes: "Nothing herein * * * shall be construed to effect (sic) any right, title, interest, lien or claim of either of the respective parties hereto, * * * in or to the said goods or accounts of the proceeds thereof."

Frederick M. Czaki, for complainant.
George W. Schurman, for defendant.

HAND, District Judge (after stating the facts as above).   If the receiver gave up no rights, the defendant got no protection from the contract, because without it he had the power to sell off the stock.   He would have been in no worse situation without the contract than with it, for without it the complainant could have done no more than elect to charge him with the value, or the proceeds according as it was to his interest and to refuse to allow him his expenses, and that is precisely what he wishes to do, as it is.   On the other hand, the obvious purpose of the receiver as the contract states was to get the stock sold as soon as possible.   While it is true that he might have thrown out the credits if the defendant sold or held the defendant for the depreciation of the goods, if he did not, the defendant might have preferred to let the stock remain unsold and fight the issue of depreciation, instead of realizing upon the goods and being obliged to lose all his expenses.   Therefore the receiver insured himself of a sale under the most advantageous conditions, which were derived from the defendant's exceptional access to the market and his very complete business organization; and he likewise obtained a joint control over all the sales, which he could not otherwise get.   Now, the complainant's construction not only removes any incentive to the defendant to enter into the contract, but also in so far as it does so remove all incentive would have deprived the receiver of the assurance that the defendant would in fact sell the goods and so realize their value.   All this makes most improbable the complainant's interpretation.

Coming now to purely verbal construction, so far as concerned the property remaining in specie on January 15, 1903, the receiver had in equity only one right or remedy, which was to compel its redelivery in specie, with possibly damages for depreciation, as I have suggested.   It is true that he might have claimed, and may still retain, a right to sue at law in conversion, but that is irrelevant to this suit in equity.   So far as concerns any goods sold after January 15, 1903, he therefore, by his consent to their sale, abandoned all rights which he then had in equity.   This is definitely corroborated by the fact that the parties provide that they "shall have * * * the same rights * * * in the proceeds as they had in the property itself."   The use of the imperfect tense "had" indicates clearly enough that they recognized that at the time when the proceeds were to come into existence the rights of both in the property would be already in the past.   This disposes of the complainant's entire contention in this suit that the contract preserved his rights "in the property" because even upon the most literal interpretation no possible construction can be placed on the words which does not involve the destruction of the only rights the receiver had in equity.   His intention must have been to substitute the proceeds for the goods.

It is true that the contract preserved any right to charge the defendant for damages arising from the deterioration of value in the

goods during the month between December 15, 1902, and January 15, 1903, but there is no evidence of any such depreciation, and this may therefore be neglected. If the complainant should urge that although he necessarily waived his right to a physical delivery of the goods which remained in specie on January 15, 1903, yet his rights are to be taken as if he had not consented to their sale, and as if they still continued in specie, I can only say that the contract says nothing of the sort. It says that all rights in the property shall be preserved, and yet provides that the only existing right of equitable cognizance shall be destroyed. The only reasonable intention to be gathered from this verbal contradiction is that which the defendant has adopted.

Therefore the sale of all goods on and after January 15, 1903, was by consent and rightful. The defendant was liable for only what he received and could charge his reasonable expenses. Hence the account after that date was correctly stated by the master, except as to certain matters considered later on.

This argument does not apply to so much of the goods as the defendant had already sold prior to January 15, 1903. As to these the estate was at that time entitled to an account in equity charging the defendant with either their value, or the proceeds, and I cannot construe the contract as going so far as to release those existing rights, especially in view of the explicit reservations to the contrary. While these goods amount to only about $3,000 out of a total of nearly $13,000, I shall have to consider them separately later.

I have heretofore assumed that the agreement when ratified was valid, but this the complainant denies. To make plain the precise issues several irrelevant propositions must be laid to one side. First, is the question of the court's jurisdiction summarily to determine any controversies regarding a res in adverse possession of a third person. This is not involved here because the defendant consented to sell the goods under the agreement. Hence all talk about Whitney v. Wenman, 198 U. S. 580, 25 Sup. Ct. 778, 49 L. Ed. 1157, and kindred cases, is beside the point. It may be admitted that a sale by the receiver out of possession would be a nullity, and would confer no title. The question is whether after adjudication, which was on January 9, 1903, and with the consent of the adverse holder, he may bind the estate. Second, it is of no consequence whether the order was in fact necessary for the preservation of the estate, because that was a matter for the discretion of the court when it made the order, and does not go to its jurisdiction. Obviously the sales could not be now reopened upon a review of the court's determination of that necessity. Either the court had jurisdiction, though not in possession, to determine the necessity for sale, or it had not. I cannot review the actual determination collaterally. Raht v. Attrill, 106 N. Y. 428, 13 N. E. 282, 60 Am. Rep. 456, was a case where the receiver's certificates were issued in an action to which the trustee for bondholders was not a party. It could not therefore conclude them. Here after the adjudication all parties could be bound by an order, except the defendant, who consented.

The question is then resolved into this: Whether the court has jurisdiction with the consent of the adverse claimant to authorize its receiver after adjudication, though out of possession, to consent to a sale of the property in the interests of its preservation. I cannot find any case squarely upon this point in either brief. Of course, it is well settled that, though only entitled to possession, a receiver may after adjudication give a good title under the court's order. However, all such orders presuppose possession by the receiver, and here he had no possession.

Yet Bryant v. Swofford Company, 214 U. S. 279, 29 Sup. Ct. 614, 53 L. Ed. 997, clearly authorizes such an agreement if the receiver gets possession in pursuance to the agreement. While I should not say that the contract in the case at bar went so far as that in Bryant v. Swofford Company, and actually put the receiver into joint possession with the defendant, it unquestionably recognized a joint control of the sales and of the proceeds. The words are "an orderly disposition of said property under their joint supervision and control." Again, "Said sale shall be conducted for the joint account of said parties hereto." The defendant, though an adverse holder, admitted the possible interest of the receiver and his right to share in the management of the property, and that was enough to give the court the power and duty to direct him in the control so conceded to him. Had the contract provided that the defendant's possession should be considered that of the receiver, but that he should still be entitled to physical custody for purposes of sale, all formal difficulties would be avoided. I cannot believe that the law requires a mere change in form such as that to give validity to the order.

After all, what is the basis of jurisdiction in such cases? When the court has full possession of the res, a possession which it can defend, all others must come to it to assert any rights. If it has no possession, those who have are free to act as they choose, unless the court can obtain personal jurisdiction over them. But the court has power after adjudication, even through a receiver, to sell the interests of all creditors and of the bankrupt. Where an adverse party has possession, it could not enforce its sale, or put its purchaser in possession, but if the adverse party consents and co-operates, why cannot the court in a necessary case pass the title of the creditors and bankrupt quite as well as if it had possession? The only difficulty in principle is the possession of an adverse party, and that difficulty is removed by his consent, which it would be a contempt for him subsequently to revoke.

Moreover, the delay of the trustee should estop him on principles of good conscience. It is true that before he was appointed trustee on April 23, 1903, nearly all the goods had been sold, but he should have expressed some dissent even though the thing was done. He says that he relied on his interpretation of the contract, but he made no effort to see whether his interpretation agreed with the defendant's, and he slept for over four years without suggestion of complaint. I do not say it was dishonest, but I do think it is now too stale a contention to urge. In Bryant v. Swofford Company, 214 U. S. 279, 291, 29 Sup. Ct. 614, 53 L. Ed. 997, the receiver received

as property covered by a contract certain property in fact not within its terms. The contract was valid, and the adverse party was held entitled to all the property, including that part received but not in fact covered by the contract. It did not appear that the adverse party had acted upon the faith of the receiver's supposition that the contract covered the property, but the court thought it too late for the trustee, after a lapse of less time than has elapsed in this case, to claim any part of it. There was not so much of an estoppel as in this case, nor was the claim so stale, but the trustee was concluded.

Having disposed of those items of the account which arose on and after January 15, 1903, I must next consider the earlier items. The parties do not seem to have adopted the practice laid down for a general accounting in equity. Under the seventy-ninth equity rule, which follows the sixty-first of the English Orders in Chancery, the accounts should follow the old English practice as stated in the standard books. 2 Daniell's Chancery, *p. 1221; 2 Smith, Chancery Practice, c. 13. In view of the unfamiliarity of many practitioners with the procedure, it may not be amiss to state what that practice was, modified in so far as the federal practice requires. The defendant should first file with the master an affidavit having annexed thereto all his account, containing both debit and credit items. At the end of a specified time fixed by the master, the complainant must file what was termed "the charge," which contained simply the transcript of all the debit items of the account as filed by the defendant and those added items, or increases in items with which he seeks to charge the defendant. Upon filing this with the master, the case proceeds upon the examination of the defendant and the taking of other testimony until all evidence concerning the items in the "charge" has been completed. Thereupon the defendant will file his "discharge," consisting of all the credit items taken from the account and supported by his vouchers for amounts over $20. Remsen v. Remsen, 2 Johns. Ch. (N. Y.) 495. Testimony should then be taken on the items of "discharge," and, upon completion of the testimony, the master is in a position to state the account. The onus probandi is upon the complainant as to any items of the "charge" which are not admitted in the account as filed (2 Smith, Chancery Practice, p. 127), and upon the defendant as to all the items of "discharge."

In the case at bar two questions arise: First, as to the proper items of "charge" prior to January 15, 1903; and, second, as to items of "discharge" prior to the same date. I am satisfied from the testimony that the master was correct in finding that the best evidence of the value of the goods was the price at which they were sold by the defendant, considering the conditions under which those sales were made. The value of a thing is what under normal conditions it will sell for, and the best evidence of that when you are sure that the sale is under such conditions is the actual sale itself. There are, of course, many cases where you cannot be sure of excluding exceptional factors bearing on the sale, but the sales made by the defendant were under conditions to obtain "the greatest possible value for the property," as the complainant himself while receiver ac-

knowledged in one of the recitals to the contract. I need not trouble about the New York decisions cited; for, independently of my personal judgment that Parmenter v. Fitzpatrick, 135 N. Y. 190, 31 N. E. 1032, controls in any case, Re Bloch, 109 Fed. 790, 48 C. C. A. 650, gives me the right to use this evidence. The complainant says that in no case were the sales made by the interested party, but in Parmenter v. Fitzpatrick they were made by the judgment creditors, to whom, of course, the sheriff looked for indemnity.

I attach no practical value to the inventories, certainly in the face of the sales made so soon thereafter. It would be in my judgment a very absurd and shocking result to charge the defendant in the face of the sales, because some 10 days before he got possession he prepared an estimated valuation such as this inventory. Not only is it open to suspicion as to the values contained, but the very presence of all the goods on the 15th of December is doubtful. The master has found the value to be the proceeds realized. Being satisfied that he had the right to consider the sales as evidence of value, I should have to entertain a very different opinion upon the facts to reverse his report.

As to the items of "discharge" prior to January 15th, they must be all disallowed in accordance with the well-settled rule that any services rendered, or disbursements made, by a trustee ex maleficio, are made upon his own account, and cannot be credited to him when he comes to account in a court of equity. There is nothing unjust in this. The defendant wrongfully seized the goods, and at once began selling them, which he had no right to do, and which he knew he would be held liable for doing. In selling them he made certain disbursements, but they were not made at the request of the trustee or of receiver or of any other person. By all rules of equity they must be held to be purely voluntary, and he cannot credit himself with them.

The questions remain of interest, disputed items of "discharge," and costs. First as regards the question of interest. By December 19, 1902, the defendant had received clear intimation that the receiver regarded his possession as wrongful, for he attempted by summary order to obtain possession. It is, of course, quite true, at least in theory, that a subsequent trustee might not agree with the receiver, but I am satisfied that the defendant took his chances in retaining possession after that time, and that no demand was necessary. From then he became a trustee ex maleficio, having seized from the estate property which he had no right to retain and which he knew was being claimed. Interest must therefore be charged against him at least from the time when he sold the property, and I can see no reason why he should not pay interest at the legal rate. Were he a duly constituted trustee, he would be obliged to pay only such interest as he in fact received or should have got, but I think it will not be contended that he has any such exemption from the time when his retention became wrongful. A question does arise as to interest between December 15, 1902, and the date of sale of the property which was all substantially completed by the end of June, 1903. As

this suit was in the first instance to obtain the property itself and not an action of conversion, I do not think that interest should be charged against the defendant while the property remained in specie. While the contract authorized the sale, it certainly did not mean to authorize his possession either of the property or of the proceeds. I shall therefore charge him with interest at 6 per cent. from the date of the sale of each article and from the collection of each account.

As to the three items of discharge for rent, labor, and commissions, I will allow them all; the only one upon which I have any doubt being the commissions. I am inclined to think the word "compensation" used in the contract must have meant more than the defendant's actual outlay, which seems to be covered by the word "costs." Of course, it may have meant the "compensation" to his employés, but it is more equitable to construe it as meaning a compensation to himself. It is no doubt difficult to ascertain just what benefit to the sale of a stock of goods is derived from the personal superintendence of the merchant, independently of the services of those who conduct his business, but I think no one can deny that there is some substantial additional value derived from it, and I do not believe that the defendant intended, in case the proceeds were eventually all to be turned over to the complainant, that he should remain unpaid for such services. These three items must, however, be allowed at only such proportion of their total amount as the gross proceeds from the goods sold on and after January 15, 1903, represents to the total gross proceeds. While this is only an approximation as to some of the items, it will serve as justly as any other rule.

As to costs, I shall allow the complainant the docket fee and all the disbursements up to and including the interlocutory decree. In doing this I am quite aware that the complainant has demanded more than he has received under the decree, and that his bill of complaint sought to go back until the 1st day of September, 1902. In that respect he failed, but the defendant had acted without any regard for the legality of his acts. He seized all he could get, and he took all chances of violating the law. He must now pay costs when the chance has gone against him. The costs after the interlocutory decree must be borne by the complainant. The only doubt which I had was as to the costs up to the filing of the formal account.

It is true that all the proof taken by the defendant was strictly speaking irrelevant till the complainant in his "charge" sought to surcharge the account as filed. Thereafter, the complainant, not the defendant, was called on to substantiate the surcharge. 2 Smith, Chancery Practice, 127. Therefore the defendant was accepting an onus probandi which was not his. However, no one seems to have followed the proper practice, and the complainant cannot object, because the defendant accepted an onus which he need not have done. It was obvious enough that his accounts were to be disputed, and all the testimony taken was at some time or other material to the dispute. The complainant has been unsuccessful, except as to some of the items of discharge, which caused none of the disbursements. Therefore the complainant must pay the defendant's disbursements

after the interlocutory decree, for I shall look at the substance of the contract, not at its form.

One respect in which the master has departed from the course of equity practice is so important that I feel bound to notice it. Having correctly served his draft report and awaited objections, he added to his final report his disposition of certain "requests to make findings of fact" which the complainant filed with him. Of course, the master may embody his conclusions in separately numbered findings, if he wishes, but he should not rule on "requests to find," and, most of all, he should not incorporate such rulings in his report. The objections may be the basis for a revision of his report if the master be so advised, but that is all. "Requests to find facts" are, so far as I can find after considerable investigation, wholly unknown in equity practice in the federal courts, and in this instance are undoubtedly borrowed from the practice of the New York Code which was found once so intolerably burdensome, as to be repealed, and which, having been now re-enacted with the hope of giving a larger scope of review to the New York Court of Appeals, has again become a most vexatious annoyance to the judges. While, no doubt, only those exceptions to the final report are good which were taken by objection to the draft report, the objections will themselves come up with the final report, and ordinarily will not be regarded at all, unless some point should be made as to the validity of the exceptions. It is in my judgment better that a report read as a narrative, and certainly it should not be cut up with statements as to what the master declined to find. While the document here incorporated is not within rule 76, that is only because it is quite anomalous in equity practice, and the rule certainly forbids what was actually done in this cause.

Let a decree pass as follows: Charging the defendant with the actual gross proceeds collected from all accounts paid after December 15, 1902, and from the sale of all goods sold before or after January 15, 1903, crediting the defendant with all items of discharge in his account on or after January 15, 1903, except a certain proportion of the disputed items as mentioned above, charging interest from the receipt of each item of charge at 6 per cent. and crediting interest similarly upon each item of discharge allowed; directing the defendant to pay costs and disbursements to the date of the interlocutory decree, and crediting him with his disbursements thereafter; permitting the defendant, upon giving security, to retain so much of the sum directed by the decree as the face of his proposed claim in bankruptcy bears to the sum of all claims, including his own; permitting the complainant to apply at the foot of this decree at any time for a modification compelling the defendant to pay over the retained portion upon the ground either of his unreasonable delay either to file or press his claim in bankruptcy, or of its disallowance in whole or part by the bankruptcy court; permitting likewise the complainant to apply at the foot of the decree to compel the defendant to pay over his proportion of any expenses in bankruptcy past or future upon due proof of their payment; finally, allowing either party to apply at the foot of the decree for any other modification thereof.